**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE**

| | | |
|---|---|---|
| **APPALACHIAN VOICES** *et al.* | ) | |
| | ) | **Case No. 3:23-cv-00604** |
| **v.** | ) | **Judge Richardson** |
| | ) | **Magistrate Judge Holmes** |
| **TENNESSEE VALLEY AUTHORITY** | ) | |

<u>**O R D E R**</u>

Pending before the Court are two motions filed by Plaintiffs Appalachian Voices, Center for Biological Diversity, and Sierra Club ("Plaintiffs") to which Defendant Tennessee Valley Authority ("TVA") has responded in opposition:

(1)   Plaintiffs' motion to complete the administrative record (Docket No. 28), to which TVA filed a response in opposition (Docket No. 29), Plaintiffs filed a reply in support (Docket No. 31), and TVA filed a supplemental response in opposition (Docket No. 48); and

(2)   Plaintiffs' motion to clarify this Court's April 29, 2024 Order (Docket No. 38), to which TVA filed a response in opposition (Docket No. 41) and a supplemental response in opposition (Docket No. 41), and Plaintiffs filed a reply in support (Docket No. 49).

For the reasons detailed below, Plaintiffs' motion to complete the administrative record (Docket No. 28) is **GRANTED IN PART and DENIED IN PART**, and Plaintiffs' motion to clarify (Docket No. 38) is **GRANTED IN PART and DENIED IN PART**.

## I.    BACKGROUND

Plaintiffs seek judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06, of TVA's decision to build a gas-fired power plant in Middle Tennessee (the "Cumberland Gas Plant"). (Am. Compl., Docket No. 16 at ¶ 10.) Plaintiffs claim that TVA failed to comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq.*, because TVA did not "fairly" or "adequately" consider the "significant impacts" that its decision to build the Cumberland Gas Plant would have on the climate, environment, and power customers.

(*Id.* at ¶¶ 1–2.) Plaintiffs assert that TVA failed to take the following actions, all of which were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under NEPA, 5 U.S.C. § 706(2)(A):

1. Issue a record of decision before committing to Alternative A, the Cumberland Gas Plant;

2. Take a hard look at the climate consequences of the Cumberland Gas Plant;

3. Take a hard look at the impacts of a connected action;

4. Objectively consider reasonable carbon-free energy alternatives;

5. Rely on accurate economic assumptions to compare alternatives; and

6. Supplement the final environmental impact statement.

(*Id.* at ¶¶ 148–262.) In response, TVA broadly denies that it violated NEPA. Instead, it argues that it complied with all requirements related to the environmental impact statement ("EIS") it released regarding its decision to build the Cumberland Gas Plant. (Answer, Docket No. 17.)

The Court set a deadline for TVA to file the administrative record (Scheduling Order, Docket No. 23 at ¶ K), which it did in a timely manner (Notice of Filing, Docket No. 27). However, Plaintiffs contend that the administrative record is incomplete and that two categories of records should be added: (1) contracts that TVA entered into with Tennessee Gas Pipeline Company (the "Precedent Agreement") and with General Electric Company (the "GE Contract"); and (2) studies and plans that TVA relied on in its Final EIS. (Mot., Docket No. 28.) TVA disagrees and argues that the administrative record is complete and that no other documents need to be included. (Resp., Docket No. 29.)

On April 29, 2024, the Court entered an Order (the "April 29 Order") that partially granted Plaintiffs' motion and found that the two contracts should be added to the administrative record. (Order, Docket No. 37 at 7–15.) However, the Court reserved a ruling on whether the studies and

2

plans should be added. (*Id.* at 16–19.) The Court set a hearing – which the parties had requested – so that the Court could better understand the scope and context of the studies and plans, as well as the parties' positions on certain legal issues. (*Id.* at 18–19.)

Shortly after the Court issued the April 29 Order, Plaintiffs filed a motion to clarify the order. (Mtn., Docket No. 38.) In their motion, Plaintiffs stated that the April 29 Order was unclear in two respects: (1) whether the Court ordered TVA to add *unredacted* copies of the contracts to the record; and (2) whether the Court ordered TVA to add records of expenses incurred in fulfillment of the contracts to the record.

On May 16, 2024, the Court held a hearing to discuss Plaintiffs' motion to complete the administrative record and whether the studies and plans should be added to the record, and to discuss Plaintiffs' motion to clarify the April 20 Order. (Hr'g Tr., Docket No. 45.) Appearing for Plaintiffs were O.W. "Trey" Bussey, III and Gregory D. Buppert, and appearing for TVA were David D. Ayliffe and Frances Regina Koho. (*Id.* at 2.) After the hearing, the Court issued an Order directing the parties to file additional briefing in support of both pending motions. (Order, Docket No. 43.) The parties complied and the two motions are now fully briefed.

## II.     LEGAL STANDARD[1]

Judicial review of agency actions under NEPA is governed by the APA, which provides, in part, that a Court action shall "hold unlawful and set aside agency action, findings, and conclusions" that are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency rule would be "arbitrary and capricious"

---

[1] To be clear, the Court recites the standards for judicial review of agency actions under NEPA solely to provide context to the instant contested matter. Nothing in this order should be relied on or construed as any determination broader than this dispute over the contents of the administrative record.

if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfr. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Under NEPA, "[t]he role of the courts . . . is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious." *Kelley v. Selin*, 42 F.3d 1501, 1512 (6th Cir. 1995).

To decide whether an agency complied with NEPA under the APA, the Court must "review the whole record or those parts of it cited by a party." 5 U.S.C. § 706. The administrative record includes "all materials 'compiled' by the agency that were before the agency at the time the decision was made." *Sierra Club v. Slater*, 120 F.3d 623, 638 (6th Cir. 1997) (citing *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996)). Under the APA, to assess the legality of the agency's action, the Court must have access to the full administrative record that was before the decisionmaker at the time the decision was made. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419–420 (1971) (abrogated on other grounds by *Califano v. Sanders*, 430 U.S. 99, 105 (1977)). "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Kroger Co. v. Reg'l Airport Auth. of Louisville & Jefferson Cnty.*, 286 F.3d 382, 387 (6th Cir. 2002) (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973)).

With respect to what is properly included in the administrative record, it is "axiomatic that documents created by an agency itself or otherwise located in its files were before it." *Cnty. of San Miguel v. Kempthorne*, 587 F. Supp. 2d 64, 76 (D.C. Cir. 2008). However, "deliberative process

materials" are generally exempted from inclusion in the record to protect the quality of agency decisions by ensuring open and candid conversations. *City of Crossgate v. U.S. Dep't of Veterans Affs.*, No. 3:18-cv-167-CHB-CHL, 2020 WL 1812014, at *3 (W.D. Ky. Feb. 12, 2020) (citing *San Luis Obispo Mothers for Peace v. Nuclear Regul. Comm'n*, 789 F.2d 26, 44–45 (D.C. Cir. 1986)). Nevertheless, an agency "may not exclude information from the record simply because it did not 'rely' on the excluded information in its final decision." *Banner Health v. Burwell*, 126 F. Supp. 3d 28, 58–59 (D.D.C. 2015), *affirmed in part, rev'd in part*, 867 F.3d 1323 (D.C. Cir. 2017) (citing *Maritel, Inc. v. Collins*, 422 F. Supp. 2d 188, 196 (D.D.C. 2006)).

> Rather, "a complete administrative record should include all materials that might have influenced the agency's decision[.]" "[W]hile it is true that data and analysis compiled by subordinates may be properly part of the administrative record despite not having actually passed before the eyes of the [decisionmaker]," to be included in the Administrative Record, "the data or analysis must be sufficiently integral to the final analysis that was considered by the [agency], and the [agency's] reliance thereon sufficiently heavy, so as to suggest that the decisionmaker constructively considered it."

*Id.* at 59 (internal citations omitted).

The administrative record filed by an agency has a "presumption of regularity," though the record is not always complete as filed. *Protect Our Aquifer v. Tenn. Valley Auth.*, No. 2:20-cv-02615-TLP-atc, 2022 WL 341014, at *2 (W.D. Tenn. Jan. 24, 2022) (quoting *Ohio Coal Ass'n v. Perez*, No. 14-2646, 2017 WL 4900165, at *3 (S.D. Ohio, Feb. 27, 2017)). Some circumstances "justify supplementation of the administrative record" with additional documents. *Latin Ams. for Soc. & Econ. Dev. v. Adm'r of the Fed. Highway Admin.*, 756 F.3d 447, 465 (6th Cir. 2014). For example, if a party can present "clear evidence" to show that documents were before the decisionmaker but are missing from the record, courts will add those documents to the administrative record. *Protect Our Aquifer*, 2022 WL 341014 at *2 (citing *Bullwinkel v. U.S. Dep't of Energy*, No. 11-1082, 2013 WL 384902, at *2 (W.D. Tenn. Jan. 16, 2013)). A party can produce

"clear evidence" that the record is incomplete by showing that "an agency has deliberately or negligently excluded certain documents from the record." *Id.* (citing *Bullwinkel*, 2013 WL 384902 at *2).

Accordingly, merely alleging that a record is incomplete is not enough to rebut the "presumption of regularity." If this were the case, "there would be no presumption of a complete record because the possibility that internal, deliberative documents exist would occur in every APA case." *Blue Ocean Institute v. Gutierrez*, 503 F. Supp. 2d 366, 371 (D.D.C. 2007). Instead, the movant "must identify reasonable, non-speculative grounds for its belief that the documents were . . . not included in the record," like by attaching the allegedly relevant documents to their motion, and "prov[ing] that the documents were before the actual decisionmakers." *Protect Our Aquifer*, 2022 WL 341014 at *2 (citing *Sara Lee Corp. v. Am. Bakers Ass'n*, 252 F.R.D. 31, 34 (D.D.C. 2008)).[2]

### III.    ANALYSIS

The Court must decide whether TVA is required to complete the record with: (1) studies and plans that TVA relied on in its Final EIS; (2) *unredacted* copies of the Precedent Agreement and the GE Contract; and (3) records of expenses incurred in fulfillment of the Precedent Agreement and the GE Contract.

### A.    STUDIES AND PLANS IN THE FINAL EIS

Plaintiffs argue that TVA "deliberately or negligently excluded from the administrative record numerous critical materials the agency cited and considered in its Final EIS." (Mem., Docket No. 28-1 at 15.) Plaintiffs point to seven references in the Final EIS:

---

[2] *See* April 29 Order, Docket No. 37 at 5 n.2.

| | Document | AR Location | Reference |
|---|---|---|---|
| 1 | FY22 Budget Power Supply Plan | Final EIS (Appendix B, TVA Alternatives Evaluation), AR 002419 | "TVA staff utilized the FY22 Budget Power Supply Plan as the basis for the CUF [Cumberland Fossil Plant] Retirement EIS Alternatives analysis. For each alternative, a 20-year study was performed using expansion and production cost models." |
| 2 | 20-Year Study | | |
| 3 | TVA's Financial and System Analysis | Final EIS (Appendix B, TVA Alternatives Evaluation), AR 002425 | "TVA's financial and system analysis, using the least-cost planning framework along with consideration of the environmental impacts of the three alternatives, indicates that Alternative A, retirement of CUF and replacement of the first unit with a CC [Combined Cycle] Plant at the CUF Reservation, is the Preferred Alternative." |
| 4 | Interconnection and Transmission Evaluations | Final EIS (Appendix B, TVA Alternatives Evaluation), AR 002415 | "Sites will require interconnection and transmission work (evaluations conducted during the EIS indicated an expected duration 9 to 11 years)." |
| 5 | Solar Plus Storage Evaluation and Reliability Analysis | Final EIS, AR 001870 | "TVA performed a reliability analysis to determine an appropriate combination of solar and storage resources to maintain year-round system reliability for Alternative C. TVA began the solar plus storage evaluation by determining the appropriate level of solar resources needed to replace the energy needs resulting from the retirement of the CUF unit." |
| 6 | Current TVA Load Forecasts | Final EIS, AR 001875–76 | "Upon incorporating these trends, current TVA load forecasts point to slightly increasing peak loads over the next 20 years." |

| 7 | Analysis for the Entire TVA-Wide Power System | Final EIS, AR 002115 | "An analysis for the entire TVA-wide power system was performed using industry standard capacity planning and production cost models, ABB's System Optimizer and Energy Exemplar's Aurora. . . . The differences between each alternative are specific to the decision to retire or not retire Cumberland Fossil Plant and the associated replacement generation outlined in each alternative." |

(*Id.* at 15–16.)

Plaintiffs argue that these documents should be added to the record because TVA staff created them. (*Id.* at 16.) They also argue that the documents belong in the record because they are cited in the Final EIS, which demonstrates that TVA staff directly considered the documents in drafting the Final EIS. (*Id.*) Accordingly, Plaintiffs argue that TVA's CEO indirectly considered the documents because TVA staff directly considered them. (*Id.* (citing *Fort Sill Apache Tribe v. Nat'l Indian Gaming Comm'n,* 345 F. Supp. 3d 1, 3–6 (D.D.C. 2018); *WildEarth Guardians v. U.S. Forest Serv.*, 713 F. Supp. 2d 1243, 1260, 1264 (D. Colo. 2010); *Amfac Resorts, LLC*, 143 F. Supp. 2d at 12).) Plaintiffs argue that TVA may not exclude unpublished, internal materials or underlying data, and that these documents are not shielded by the deliberative process privilege.

TVA responds by asserting that TVA's CEO did not "actually consider[]" these documents, so they need not be included in the record. (Resp., Docket No. 29 at 18.) TVA argues that the standard for inclusion is not whether the documents are relevant or were referenced, but whether the decisionmaker considered them either directly or indirectly. (*Id.* at 18–19.) It states that much of the information contained within the documents that Plaintiffs seek to add to the record is already contained and explained within the existing record. (*Id.* at 20.)

To support this contention, TVA cites to a declaration from Brian Child, TVA's Vice President of Enterprise Planning, which is a department or section of TVA that establishes and oversees TVA's strategic financial and resource planning. (Child Decl., Docket No. 29-5, ¶ 6.) In

8

his declaration, Mr. Child states that six of the seven documents that Plaintiffs seek to add to the record are "redundant" because they all seek "information relating to Enterprise Planning's modeling and analyses of the TVA power system to evaluate the three alternatives studied in the [Final] EIS." (*Id.*) He asserts that this modeling (including modeling methodologies, input parameters, and results) is "thoroughly explained" in the Final EIS. (*Id.* at ¶ 7.)

TVA argues that the statements in Mr. Child's declaration show that Plaintiffs are not able to establish that "the record as presented cannot allow substantial and meaningful judicial review." (Resp., Docket No. 29 at 21 (quoting *Save the Colorado v. U.S. Dep't of the Interior*, 517 F. Supp. 3d 890, 986 (D. Ariz. 2021)).) It contends that Mr. Child's statements show that the studies and plans in the EIS are not "necessary" to determine whether TVA took a "hard look" at the environmental impact of the proposed action. (*Id.* (citing *Coal. for Responsible Reg'l Dev. v. Coleman*, 555 F.2d 398, 400 (4th Cir. 1977)).)

### 1.  Docs. 1, 2: "FY22 Budget Power Supply Plan" and "20-Year Study"

The Final EIS references the "FY22 Budget Power Supply Plan" (Doc. 1) and the "20-Year Study" (Doc. 2) in Appendix B, which is titled "TVA Alternatives Evaluation." (Final EIS, AR 002401–26.) This appendix is comprised of a document titled "Cumberland Retirement EIS: Final Alternatives Evaluation," which was created by "Enterprise Planning" in November 2022. It provides an overview of TVA's decision to build the Cumberland Gas Plant and analyzes the alternatives that TVA considered. The two documents at issue are referenced as follows:

> Evaluation Approach
>
> TVA staff utilized the <u>FY 2022 Budget Power Supply Plan</u> as the Basis for the CUF [Cumberland Fossil Plant] Retirement EIS Alternatives analysis. For each analysis, a <u>20-year study</u> was performed using expansion and production cost models (System Optimizer and Aurora, respectively).

(Final EIS, AR 002419 (emphasis added).)

The parties have described the relationship between these two documents in various ways. In its supplemental response, TVA describes these two documents as "one and the same" and states that they are "the combination of the data results from the modeling TVA conducts that forecasts on a 20-year horizon." (Suppl. Resp., Docket No. 48 at 11.) In his declaration, Mr. Child describes these two documents – as well as "TVA's Financial and System Analysis" (Doc. 3), "Current TVA Load Forecasts" (Doc. 6), and "Analysis for the Entire TVA-Wide Power System" (Doc. 7) – as "relating to Enterprise Planning's modeling and analyses of the TVA power system to evaluate the three alternatives studied in the Cumberland EIS." (Child Decl., Docket No. 29-5 at ¶ 6.) However, Mr. Child differentiates the two documents and states that the "FY22 Budget Power Supply Plan" (Doc. 1) relates to "the capacity optimization and production cost modeling used by Enterprise Planning to support the FY22 Budget submitted to the TVA Board," while the "20-Year Study" (Doc. 2) relates to "industry standard proprietary modeling tools/software that Enterprise Planning used to model the three alternatives studied in the Cumberland EIS." (*Id.*)

TVA goes on to describe the "FY22 Budget Power Supply Plan" (Doc. 1), and therefore the "20-Year Study" (Doc. 2) as well, as "the baseline for evaluating each alternative in the Cumberland EIS, which is presented in Appendix B." (Suppl. Resp., Docket No. 48 at 11.) However, TVA disagrees that these documents should be added to the record. First, TVA argues that these are actually not discrete documents at all, but are instead comprised of "inputs for the capacity optimization and production cost modeling used by Enterprise Planning to support the FY22 Budget submitted to the TVA Board." (Resp., Docket No. 29 at 22.) In his declaration, Mr. Child states that these documents are a "combination of the results from the then-current capacity optimization and production cost modeling utilized by Enterprise Planning." (Child Decl., Docket

No. 29-5 at ¶ 31.) TVA describes these as "the combination of the data results from the modeling TVA conducts that forecasts on a 20-year horizon." (Suppl. Resp., Docket No. 48 at 11.)

Overall, TVA asserts that these documents should not be added to the record for the following reasons: (1) underlying source data does not belong in the record (Hr'g Tr., Docket No. 45 at 40:5–7.); (2) Plaintiffs are speculating about the contents of the documents and why they need to be included (*id.* at 40:8–11); (3) Plaintiffs have not demonstrated that TVA's CEO directly or indirectly considered "the actual models or the various underlying source and/or raw data inputs used in the modeling" (Resp., Docket No. 29 at 22); and (4) these "enterprise planning analyses" are already in the administrative record (*id.* at 22–23).

Because these two documents appear not to be discrete documents but rather to consist of raw or underlying data, the question is whether that data should be added to the record. To address TVA's first objection, there is no authority stating that underlying source data as a category of information does not belong in an administrative record. In fact, many courts have held that the inclusion of underlying data in the record is proper, provided that the same standards for supplementing the administrative record are met. *See, e.g.*, *Xirum v. U.S. Immigr. & Customs Enf't*, No. 1:22-cv-00801-TWP-KMB, 2024 WL 1796121 (S.D. Ind. Apr. 25, 2024) (granting request to supplement record with underlying data); *Banner Health v. Sebelius*, 945 F. Supp. 2d 1, 28 (D.D.C. 2013), *vacated in part on reconsideration*, No. 10–01638, 2013 WL 11241368 (D.D.C. July 30, 2013) (same). As to TVA's second objection, Plaintiffs are not obligated to have a thorough understanding of the contents of the documents, but are instead required to present "clear evidence" to show that documents were before the decisionmaker. *Protect Our Aquifer*, 2022 WL 341014 at *2.

Accordingly, the Court must determine whether Plaintiffs have presented "clear evidence" that TVA's CEO indirectly considered this data. The Court finds that the answer is yes. As TVA itself states, the underlying data was "the baseline for evaluating each alternative in the Cumberland EIS, which is presented in Appendix B." (Suppl. Resp., Docket No. 48 at 11.) The fact that this data or information served as the "baseline" for TVA's evaluation of the four alternatives shows that this data was "sufficiently integral to the final analysis that was considered by [TVA], and [TVA's] reliance thereon sufficiently heavy, so as to suggest that the decisionmaker [TVA's CEO] constructively considered it." *Banner Health*, 126 F. Supp. 3d at 59 (quoting *Banner Health v. Sebelius*, 945 F.Supp.2d 1, 27 (D.D.C. 2013)). In addition, it is "axiomatic that documents created by an agency itself or otherwise located in its files were before it." *Cnty. of San Miguel*, 587 F. Supp. 2d at 76. Accordingly, as to TVA's second objection, the Court finds that Plaintiffs are not speculating about the contents of the documents and that TVA has underscored why the documents need to be included in the record. And as to TVA's third objection, Plaintiffs have demonstrated that TVA's CEO indirectly considered this data.

Finally, to address TVA's fourth objection, the fact that information within these documents may be contained and explained at other points in the administrative record does not entitle TVA to withhold the documents. The case on which TVA relies does not support its position. In *Blue Ocean Inst. v. Gutierrez*, the National Marine Fisheries Service sought to withhold certain internal documents for many reasons, including because "the agency's conclusions [as to that issue], and its supporting reasoning for its positions" were already "set forth in the record." 503 F. Supp. 2d 366, 370 (D.D.C. 2007) (bracketed addition in original). The Court agreed with the agency that the internal documents did not need to be added to the record, but its reasoning had nothing to do with the fact that certain conclusions or information were already in the record. Instead, the Court

12

found that the internal documents did not need to be added because the moving party had not met its burden to show "a theoretical possibility that other documents not in the record exist." *Id.* at 371. Just as importantly, the Court found that the deliberate process privilege protected the withheld internal documents. *Id.* at 371–72. TVA does not set forth any additional support for its position that documents need not be added if the information is found elsewhere in the record, and the Court finds that none exists. Accordingly, the Court will not permit TVA to withhold the "FY22 Budget Power Supply Plan" (Doc. 1) and the "20-Year Study" (Doc. 2) on the basis that information within these documents exists within other documents already in the administrative record.

For these reasons, the Court will grant Plaintiffs' request to supplement the record with the "FY22 Budget Power Supply Plan" (Doc. 1) and the "20-Year Study" (Doc. 2). Although the Court finds that this information must be produced, the Court is hesitant to order TVA to produce all of the raw data that make up these documents. The Court suspects that Plaintiffs do not wish to receive and TVA does not wish to provide a "dump" of data. However, if the Court orders the production of all of the data without any further instruction to the parties, such an outcome seems inevitable. In other words, the Court understands the practical complications that are likely to arise if every bit of data is produced and the Court wishes to avoid this outcome.

Accordingly, the Court will order the parties to meet and confer over the production of this underlying data so that they can develop a plan for production and supplementation of the administrative record. The parties must discuss, at a minimum, whether there are narrowed categories of data that could be produced to both of their satisfaction; the format of the production; and the time that it may take to produce the data. The parties must then, **by no later than 28 days**

13

**after the date of entry of this order**, provide the Court with a joint status update.[3]  This filing

should also include the parties' proposal for the logistics or mechanics of supplementation of the

administrative record as directed.  For instance, do the parties propose that a single supplemental

filing will be made?  Or that there will be series of filed supplementations, including if the parties

are able to reach agreements about some but not necessarily all the additional documents? And et

cetera.

> **2.**    **Docs. 3, 7: "TVA's Financial and System Analysis" and "Analysis for the Entire TVA-Wide Power System"**

The parties discuss these two documents together. The Final EIS references "TVA's

Financial and System Analysis" (Doc. 3) in Appendix B as follows:

> Preferred Alternative
>
> <u>TVA's financial and system analysis</u>, using the least-cost planning framework along with consideration of the environmental impacts of the three alternatives, indicates that Alternative A, retirement of the CUF and replacement of the first unit with a CC Plant at the CUF Reservation, is the Preferred Alternative.

(Final EIS, AR 002425 (emphasis added).) The Final EIS references the "Analysis for the Entire

TVA-Wide Power System" (Doc. 7) in a separate section, Chapter 3, which discusses the affected

environment and environmental consequences. (Final EIS, AR 001899–2362.) The reference is

made in Section 3.7.2, which discusses environmental consequences, and even more particularly

in Section 3.7.2.6, which discusses "TVA system-wide GHG LCA [greenhouse gas lifecycle

analysis] and comparison relative to action alternatives." It states:

> 3.7.2.6.1 TVA System-Wide Production Model
>
> An <u>analysis for the entire TVA-wide power system</u> was performed using industry standard capacity planning and production cost models, ABB's System Optimizer

---

[3] To the extent that one or both parties are likely to seek Judge Richardson's review of this Order or the April 29 Order, this requirement to meet shall be suspended pending Judge Richardson's consideration of any request for a review.

and Energy Exemplar's Aurora. The capacity planning model develops a least-cost portfolio to meet demand and reserve margin while the production cost model simulates economic dispatch of the plan. The differences between each alternative are specific to the decision to retire or not retire Cumberland Fossil Plant and the associated replacement generation outlined in each alternative.

(Final EIS, AR 002115 (emphasis added).)

Plaintiffs argue that these analyses, which compared greenhouse gas emissions for the various alternatives that TVA considered, should be included in the record. (Mem., Docket No. 28-1 at 16.) Plaintiffs assert that these analyses simulated how the power system would perform over time in each of the alternative scenarios. (Hr'g Tr., Docket No. 45 at 12:18–22, 13:1–3.) These simulations indicated "how different plants would operate, how much pollution they would emit and how much each alternative would cost TVA and ultimately its rate payers." (*Id.* at 13:3–6.) Plaintiffs maintain that TVA used these analyses to conclude that Alternative C, the solar and storage alternative, would cost nearly $2 billion more than the Cumberland Gas Plant, a conclusion which Plaintiffs contend is contrary to evidence in the record. (*Id.* at 13:6–9.)

TVA believes that the analyses should not be included in the record. It describes them as a "sub-set of TVA's broader assessment of its entire power generation system." (Suppl. Resp., Docket No. 48 at 7.) TVA states that it conducts this assessment to determine "(1) the plants or units it should build or retire over a 20-year period, (2) how they will operate, and (3) the related costs that will be incurred." (*Id.* at 7–8.) TVA says the assessment is made using two different software systems – System Optimizer, a capacity expansion model, and Aurora, a production cost model. Several pieces of information are input into System Optimizer, including future electric demand, hourly commodity price forecasts, and the costs of existing power plants and contracted assets, among others. (*Id.* at 8–9.) It asserts that these inputs are comprised of a large amount of data. (*Id.* at 9.) For example, one input alone "consists of over 8,000 rows and 18 columns of data

15

with over 300 million data points." (*Id.*) Many of the same inputs are used for Aurora. (*Id.*) TVA argues that this "disaggregated data . . . would be unhelpful to the Court's review, absent the proprietary software licensed by TVA *and* TVA's explanation of the meaning of the data in the context of the proposed project, which TVA has already provided in the record." (*Id.* at 10–11.) TVA juxtaposes these analyses with the "Current TVA Load Forecasts" (Document 6), which are "updated and presented annually to the TVA board." (*Id.* at 10.)

The Court agrees with Plaintiffs that the data underlying TVA's Financial and System Analysis (Doc. 3) and Analysis for the Entire TVA-Wide Power System (Doc. 7) must be included in the administrative record. There is no question that this data was before TVA's decisionmaker, at least indirectly, as part of the decision-making process. TVA clearly relied on the information contained within the analysis to determine that "Alternative A, retirement of the CUF and replacement of the first unit with a CC Plant at the CUF Reservation, is the Preferred Alternative." (Final EIS, AR 002425.) Further, the information generated by these analyses is "specific to the decision to retire or not retire Cumberland Fossil Plant and the associated replacement generation outlined in each alternative." (Final EIS, AR 002115.) In other words, TVA specifically used the data that Plaintiffs seek in order to determine that the Cumberland Gas Plant was the best alternative.

Further, Plaintiffs contend that the underlying data contains information that TVA used to support its conclusion that Alternative C would cost nearly $2 billion more than the Cumberland Gas Plant, which Plaintiffs believe is contrary to evidence in the record. Accordingly, it is the underlying data itself that is at issue. *See Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, No. C-06-4884-SI, 2007 WL 3049869, at *3–5 (N.D. Cal. Oct. 18, 2007) (finding that data developed by U.S. Bureau of Land Management in off-road vehicle route designation effort should

be included in record because the "underlying . . . data" was "considered by the agency in its route designation process").

For these reasons, the Court will grant Plaintiffs' request to supplement the record with "TVA's Financial and System Analysis" (Doc. 3) and "Analysis for the Entire TVA-Wide Power System" (Doc. 7). However, the Court has the same concerns about the production of data with respect to these documents as it does with respect to the "FY22 Budget Power Supply Plan" (Doc. 1) and the "20-Year Study" (Doc. 2). Accordingly, the Court will also order the parties to meet and confer over the production of and supplementation of the administrative record with these documents.

### 3. Doc. 4: "Interconnection and Transmission Evaluations"

The Final EIS references "Interconnection and Transmission Evaluations" in Appendix B on a page titled "Alternative C: Solar and Battery Storage Facilities." (Final EIS, AR 002415.) It states, "Sites will require <u>interconnection and transmission</u> work (<u>evaluations</u> conducted during the EIS indicated an expected duration 9 to 11 years)." (*Id.* (emphasis added).)

Plaintiffs describe these as evaluations of "how to connect new solar and battery storage to the grid [interconnection] and how to get the electricity where it needs to be when it needs to be there [transmission]." (Hr'g Tr., Docket No. 45 at 13:17–20.) Plaintiffs assert that TVA cited to these evaluations "to conclude that any alternative, including a significant amount of solar and storage, would not be feasible," which Plaintiffs argue was an arbitrary conclusion. (*Id.* at 13:24–14:1.) Accordingly, Plaintiffs contend that these evaluations should be added to the record to help the Court determine if the conclusion was, indeed, arbitrary.

TVA disagrees and argues that the evaluations should not be added to the record. It states that the evaluations – including the estimated timeframe of 9 to 11 years – are "not contained in a

separate document but [are] instead based on simple math associated with the average time it takes to interconnect solar onto the TVA system." (Suppl. Resp., Docket No. 48 at 6.) TVA then details that "simple math." (*Id.* at 6–7.)

The Court cannot order TVA to supplement the administrative record with a document that does not exist. Accordingly, because TVA states that the "Interconnection and Transmission Evaluations" referenced in Appendix B of the Final EIS are not contained within a document, but rather are an "estimate based on the average time it takes to interconnect solar to TVA's system and the amount of solar and battery sites that can be realistically interconnected per year," the Court will deny Plaintiffs' request to supplement the record with the "Interconnection and Transmission Evaluations" (Document 4).

### 4. Doc. 5: "Solar Plus Storage Evaluation and Reliability Analysis"

The Final EIS references "Solar Plus Storage Evaluation and Reliability Analysis" in Chapter 2, which discusses the four alternatives that were before the TVA. (Final EIS, AR 001839–98.) In particular, this reference is made in Section 2.1.5, which discusses Alternative C:

2.1.5.2.1. Solar Plus Storage Evaluation and Reliability Analysis

TVA performed a <u>reliability analysis</u> to determine an appropriate combination of solar and storage resources to maintain year-round system reliability for Alternative C. TVA began the <u>solar plus storage evaluation</u> by determining the appropriate level of solar resources needed to replace the energy needs resulting from the retirement of the CUF unit. Multiple years of history were used to determine an average annual capacity factor, approximately 25 percent, and resulting average annual energy output. TVA calculated the nameplate capacity of solar resources required to supply this same amount of annual energy. The resulting calculations indicated a need for approximately 3,000 MW of nameplate solar to replace system energy provided by the first unit retirement at CUF. . . .

(Final EIS, AR 001870–71 (emphasis added).)

Plaintiffs argue that this reliability analysis should be included in the record. They assert that the analysis "assessed how much solar and storage the agency would need to replace the

generation lost from one of the retiring coal units while maintaining a certain level of reliability." (Hr'g Tr., Docket No. 45 at 14:7–10.) Plaintiffs assert that TVA "selected an amount of battery storage that significantly exceeded what another expert report in the record found necessary," which they believe demonstrates that TVA's decision was arbitrary. Accordingly, Plaintiffs contend that having access to the document that supports TVA's conclusion that "Alternative C would cost nearly $2 billion more than the Cumberland Gas Plant" is necessary.

TVA describes this section of the EIS as "refer[ring] to how TVA determined the appropriate combination of solar and storage resources to replace the retiring Cumberland coal unit and maintain year-round reliability." (Suppl. Resp., Docket No. 48 at 4.) TVA states that it calculated the solar plus storage alternative "by analyzing the available generation capacity sufficient to reliably meet TVA power system demands at any given time." (*Id.* at 3.) TVA performed this analysis using a tool called the Strategic Energy and Risk Valuation Model ("SERVM"). This tool analyzes certain inputs (i.e., 30 years of historical load and weather relationships, weather impacts on hydroelectric generation capabilities, import and export constraints, etc.) and creates outputs (i.e., range of temperatures, how often electricity demand may exceed available supply), all of which supported TVA's calculation in the Final EIS that "approximately 1,700 MW of four-hour battery energy storage systems [should be] paired with 3,000 MW of additional solar" to maintain reliability. (*Id.* at 5.)

With respect to the amount of data or information, TVA states that the results of this analysis "amount to 51 pages of data with over 14,000 individual rows of information." (*Id.* at 6.) However, TVA argues that this data would have no context and would not be helpful to the Court in its review. TVA also contends that the summary of these model results and calculations are

19

described and contextualized in the Final EIS, so there is no need to add these documents to the record.

The Court agrees with Plaintiffs that the underlying data that TVA used to support the "Solar Plus Storage Evaluation and Reliability Analysis" should be added to the record. There is no question that this data was before TVA's decisionmaker, at least indirectly, as part of the decision-making process. TVA clearly relied on this information "to determine an appropriate combination of solar and storage resources to maintain year-round system reliability for Alternative C." (Final EIS, AR 001870.) In other words, TVA specifically used the data that Plaintiffs seek in order to determine that the Cumberland Gas Plant was the best alternative.

For these reasons, the Court will grant Plaintiffs' request to supplement the record with the "Solar Plus Storage Evaluation and Reliability Analysis" (Doc. 5). However, the Court has the same concerns about the production of data with respect to these documents as it does with respect to the "FY22 Budget Power Supply Plan" (Doc. 1), the "20-Year Study" (Doc. 2), "TVA's Financial and System Analysis" (Doc. 3), and "Analysis for the Entire TVA-Wide Power System" (Doc. 7). Accordingly, the Court will also order the parties to meet and confer over the production of and supplementation of the record with these documents.

**5.      Doc. 6: "Current TVA Load Forecasts"**

The Final EIS references "Current TVA Load Forecasts" (Doc. 6) in Chapter 2, which discusses the four alternatives that were before the TVA. (Final EIS, AR 001839–98.) In particular, this reference is made in Section 2.1.6, which focuses on "alternatives considered but eliminated from further discussion." (*Id.* at AR 001875–81.) TVA stated:

> TVA continuously monitors a variety of market conditions to inform its planning, including forecasts for loads, commodities, and resource costs. Higher demand expectations for residential and support services, such as data center, is being driven by an observed shift in interstate migration patter into the Valley that is expected to

20

continue. Upon incorporating these trends, <u>current TVA load forecasts</u> points to slight increasing peak loads over the next 20 years. With the approved retirement of Bul Run Fossil Plant in 2023, TVA will be at minimum reserve targets and must therefore replace any retiring capacity with dependable capacity to maintain summer and winter load targets.

(*Id.* at AR 001875–76 (emphasis added).)

During the May 16, 2024 hearing, TVA stated that it does not object to including the current TVA load forecasts in the record. (*Id.* at 21:7–10.) Mr. Child discussed these documents and appended them to his declaration. (Child Decl., Docket No. 29-5 at ¶¶ 32–38, at 22–29).[4] Plaintiffs had no objection to including these two documents in the administrative record, but did note that there may be other documents that make up the "Current TVA Load Forecasts," which Plaintiffs contend should also be added to the record if they exist. (Hr'g Tr., Docket No. 45 at 58:7–15.)

The Court will grant in part Plaintiffs' request to supplement the record with "Current TVA Load Forecasts" (Document 6). The two documents that are appended to Mr. Child's declaration as Attachment 1 and Attachment 2 shall be added to the administrative record. (Child Decl., Docket No. 29-5 at 22–29.)[5] However, to the extent Plaintiffs seek to add any other "Current TVA Load Forecasts" documents to the administrative record, the Court will deny such a request. The Court finds that Plaintiffs have failed to provide "reasonable, non-speculative grounds" that any other documents exist. *Protect Our Aquifer*, 2022 WL 341014 at *2 (citing *Sara Lee Corp.*, 252 F.R.D. at 34).

---

[4] According to Mr. Child, the current TVA load forecasts are publicly available on TVA's website. (Child Decl., Docket No. 29-5 at ¶ 36 n.2, ¶ 37 n.3.)

[5] Again, the Court expects that the parties will meet and confer about the logistics or mechanics of supplementation of the administrative record as provided for in this order, all of which they shall address in the filing directed above.

**B.**     **CONTRACTS: UNREDACTED COPIES**

In their motion to clarify (Docket No. 38), Plaintiffs ask the Court to clarify that complete and unredacted copies of the Precedent Agreement and the GE Contract should be included in the record. Plaintiffs argue that the complete and unredacted versions of the contracts were before TVA's decisionmaker, and therefore those versions should be included in the record. (*Id.* at 4–5.) They contend that TVA can address any concerns that it may have regarding the disclosure of confidential commercial or financial information within the contracts by filing a motion for protection of that information. (*Id.* at 4.)

In response, TVA argues that the unredacted versions of the contracts should not be added to the administrative record.[6] (Docket No. 41 at 3–5.) As an initial matter, TVA asserts that the Court's April 29 Order was unambiguous in its finding that only the redacted versions of the contracts should be included. In addition, TVA maintains that the contracts contain confidential business information that is categorically excluded from disclosure as a matter of law pursuant to FOIA. (Docket No. 47 at 4–5.) TVA cites to the decision by the United States District Court for the Eastern District of Tennessee finding that certain withheld portions of the Precedent Agreement "constitute[] confidential commercial or financial information" under a FOIA exemption. *S. Env't Law Ctr. v. Tenn. Valley Auth.*, 659 F. Supp. 3d 902, 917 (E.D. Tenn. 2023).

In their reply, Plaintiffs argue that confidential information is not categorically excluded from disclosure as TVA contends. (Docket No. 49 at 2–5.) Plaintiffs stress that the governing question in this litigation, which was brought pursuant to the Administrative Procedures Act

---

[6] TVA maintains its objection that the contracts should not be added to the record at all and argues that the April 29 Order "applied the wrong standard of review in ordering inclusion of the Precedent Agreement and GE Contract." (Docket No. 41 at 4 n.2.) TVA's objections will be addressed by the District Judge at the appropriate time.

("APA"), is whether TVA directly or indirectly considered the unredacted contracts, and not whether FOIA exempts disclosure of certain information in the contracts.

The Court largely agrees with Plaintiffs that the unredacted copies of the Precedent Agreement and the GE Contract must be added to the record as these are the documents that TVA directly considered when making its decision to build the Cumberland Gas Plant.

As an initial matter, this Court has discretion to reconsider and modify interlocutory orders at any time before final judgment. *See In re Saffady*, 524 F.3d 799, 803 (6th Cir. 2008) (holding that "[d]istrict courts have inherent power to reconsider interlocutory orders and reopen any part of a case before entry of a final judgment" (alteration in original) (quoting *Mallory v. Eyrich*, 922 F.2d 1273, 1282 (6th Cir. 1991))). *See also Lee v. Vanderbilt Univ.*, No. 3:20-cv-00924, 2024 W: 2060128, at *2 n.4 (M.D. Tenn. May 3, 2024) (reviewing and amending prior sanctions order); *Mitchell v. Tennessee*, No. 3:17-cv-00973, 2020 WL 6712169, at *1 (M.D. Tenn. Nov. 16, 2020) (reviewing and amending prior order on motion to seal records). The Court finds that Plaintiffs' motion to clarify is not a motion for the Court to reverse or change a previous position, but rather is one to elucidate on the Court's prior order. Accordingly, TVA's arguments that Plaintiffs' motion must be reviewed as a motion for reconsideration are not persuasive.

In addition, the Court is not convinced by TVA's argument that confidential business information is categorically and as a matter of law excluded from disclosure in the context of a lawsuit brought under the APA. TVA argues that "pursuant to 42 U.S.C. § 4332(C) [sic], NEPA's public disclosure requirements are 'expressly governed by FOIA' exemptions." (Docket No. 47 at 4 (citations omitted).) This statute, 42 U.S.C. § 4332(C), is part of the National Environmental Policy Act ("NEPA") and "requires federal agencies to prepare an Environmental Impact Statement ('EIS') when agencies undertake major actions." *Sherwood v. Tennessee Valley Auth.*,

23

46 F.4th 439, 444 (6th Cir. 2022). Accordingly, disclosure of information during the NEPA process is governed by FOIA. *See* 42 U.S.C. § 4332(C) ("Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public *as provided by section 552 of Title 5 [FOIA]*, and shall accompany the proposal through the existing agency review processes.") (emphasis added); *S. Appalachian Biodiversity Project v. U.S. Forest Serv.*, 500 F. Supp. 2d 764, 769–70 (E.D. Tenn. 2007) (citing *Missouri v. United States Army Corps of Eng'rs*, 147 F.3d 708, 711 (8th Cir. 1998) ("NEPA's statutory language specifically indicates that disclosure to the public is to be in accord with FOIA . . . .")).

In other words, while this NEPA statute, 42 U.S.C. § 4332(C), states that the disclosure of documents during NEPA review is governed by FOIA, it does not state that the disclosure of documents during APA litigation is governed by FOIA. Accordingly, the Court finds that the controlling question is whether Plaintiffs can provide "clear evidence" that the record is incomplete by showing that TVA "deliberately or negligently excluded certain documents from the record." The controlling question is not, at this stage of proceedings, whether certain confidential information is exempted under FOIA.

The Court finds that the majority of the cases cited by both parties supports this approach to determining whether a document that may contain confidential information should be added to the administrative record in the context of APA litigation. The Court must first determine whether the information was before the decisionmaker at the time the decision was made. If the answer is yes, the document must be included in the record. At that point, the agency may move to limit disclosure of the document through a protective order or other mechanism. The Court finds two

24

decisions from the United States District Court for the District of Columbia – both of which TVA cited in its supplemental response in opposition to Plaintiffs' motion (Docket No. 47) – to be particularly relevant and helpful.

First, in *Serono Lab'ys, Inc. v. Shalala*, the Court held that the agency in the matter – the Food and Drug Administration ("FDA") – was obligated to remove trade secrets from the administrative record because it had a separate statutory obligation to do so. 35 F. Supp. 2d 1 at 3–4 (D.D.C. 1999). The Court pointed to the legal requirement that the FDA "guard the trade secrets to which it has been given access and . . . return them to the company which generated them." *Id.* at 2 (citing 21 U.S.C. § 331(j) (Supp.1998); 5 U.S.C. § 552(b)(4) (1996); 18 U.S.C. § 1905 (1984)). The Court contrasted this legal requirement with the "consideration" that "judicial review of agency action must be premised on the administrative record . . . without it the party seeking review can claim that its right to attack the agency's action is compromised since it cannot say with certainty what the agency reviewed in making its decision." *Id.*

However, when the Court considered whether "confidential" information – as opposed to statutorily protected trade secrets – should be included in the administrative record, the Court found that the best course of action was to include the documents and then determine later whether access should be restricted. *Id.* at 4. ("In the course of exercising the judicial review the order contemplates I will unquestionably entertain any argument that access, if it is permitted, be permitted only to certain persons or categories of persons. I am much more comfortable making that judgment as to a particular document when I look at the document and hear the parties' arguments. It is not a good idea to try to make lapidary judgments about documents which I have not seen or to attempt to categorize them *a priori* without seeing them."). In short, the *Serono*

*Lab'ys, Inc.* Court did not permit the agency to withhold documents because they contained confidential information.

Next, in *Pub. Emps. for Env't Resp. v. Beaudreau*, the Court took a similar approach to a request from two agencies – the Bureau of Ocean and Energy Management and the U.S. Coast Guard – to withhold and redact certain confidential business information from the administrative record. No. 10-1067, 2012 WL 12942599, at *7 (D.D.C. Nov. 9, 2012). The Court found that the agencies had not "demonstrated that this information was not before the decisionmaker at the time the decision was made, and thus, properly excluded from the administrative record." *Id.* It also found that the agencies had not asserted a legal basis to justify withholding of the information, which it contrasted to the finding in *Serono Lab'ys, Inc.*, which "consider[ed] the agency's statutory mandates to protect 'trade secrets.'" *Id.* The Court held that the confidential information would be included in the record, but the agencies could seek to amend the protective order already in place to protect the confidential information. *Id.* at *7–8 (quoting *AFL-CIO v. Nat'l Mediation Bd.*, No. 04-824, 2006 WL 197461, at 4 n.4 (D.D.C. Jan. 25, 2006) ("a protective order could be crafted to protect the confidentiality . . . or, if absolutely necessary, an ex parte submission could be presented to the Court.")).

Here, the Court has already found that the Precedent Agreement and GE Contract must be included in the record. (Order, Doc. 37 at 7–15.) As detailed previously, the Precedent Agreement was before the TVA decisionmakers, and the GE Contract was "compiled" by TVA and was "before" TVA "at the time the decision was made." *Sierra Club*, 120 F.3d at 638. TVA does not indicate whether unredacted or redacted versions of these two contracts were before the decisionmaker, though it is reasonable to assume that TVA was dealing with unredacted versions. Accordingly, the two contracts, in their unredacted forms, must be included in the record.

26

However, whether and how particular information within the two contracts should be protected is not presently before the Court. While the Court may later find that the confidential information within the Precedent Agreement and GE Contract should be protected pursuant to a protective order or other arrangement, the Court cannot find, at this juncture, that the information may be withheld from the administrative record simply because of its confidential nature.

For these reasons, the Court will grant Plaintiffs' request to supplement the record with unredacted versions of the Precedent Agreement and the GE Contract.[7] If TVA deems it necessary, it may move to protect these documents pursuant to Fed. R. Civ. P. 26(c) and Local Rule 5.03, or take any other steps it deems appropriate.

**C.    CONTRACTS: EXPENSES INCURRED**

In their motion to clarify (Docket No. 38), Plaintiffs also ask the Court to clarify that "records of any expenses incurred in fulfillment of TVA's obligations under either the Precedent Agreement or the GE Contract that precede the Record of Decision" be included in the record. Plaintiffs argue that these expenses are necessary for the Court to review their claim that TVA "impermissibly committed to building a new gas plant before completing the required NEPA review." (*Id.* at 2.)

In response, TVA argues that Plaintiffs have failed to identify the referenced "expenses" with adequate particularity, and have therefore not met their burden to "identify the materials allegedly omitted from the record with sufficient specificity, as opposed to merely proffering broad categories of documents and data . . . ." (Docket No. 41 at 5 (quoting *City of Duluth v. Jewell*, 968 F. Supp. 2d 281, 288 (D.D.C. 2013)).

---

[7] As with all other documents that will comprise the supplemental record, the parties must meet and confer, as directed above, about the logistics of production and supplementation.

27

The Court agrees with TVA that Plaintiffs have failed to present "clear evidence" that the withheld documents should be included in the administrative record. *Protect Our Aquifer*, 2022 WL 341014 at *2 (citing *Bullwinkel*, 2013 WL 384902 at *2). *See also Pub. Emps. for Env't Resp.*, 2012 WL 12942599 at *5 (citing *Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp.2d 1, 6 (D.D.C. 2006) (finding that the plaintiff could not "meet its burden simply by asserting that the documents are relevant, were before or in front of the [agency] at the time it made its decision, and were inadequately considered")). Here, Plaintiffs have failed to identify reasonable, non-speculative grounds for their belief that TVA considered these "expenses" when making its decision. Accordingly, Plaintiffs have failed to rebut the "presumption of regularity." *Protect Our Aquifer*, 2022 WL 341014 at *2. For these reasons, the Court will deny Plaintiffs' request to supplement the record with expenses related to the Precedent Agreement and the GE Contract.

## IV. CONCLUSION

For these reasons, Plaintiffs' motion to complete the administrative record (Docket No. 28) is **GRANTED IN PART AND DENIED IN PART**, and Plaintiffs' motion to clarify this Court's April 29, 2024 Order (Docket No. 38) is **GRANTED IN PART AND DENIED IN PART**.

Further, the parties are **ORDERED** to meet and confer over production of the documents, information, and underlying data to be included in the record as detailed above. With respect to "FY22 Budget Power Supply Plan" (Doc. 1), the "20-Year Study" (Doc. 2), "TVA's Financial and System Analysis" (Doc. 3), "Solar Plus Storage Evaluation and Reliability Analysis" (Doc. 5), and "Analysis for the Entire TVA-Wide Power System" (Doc. 7), the parties must discuss, at a minimum, whether there are narrowed categories of data that could be produced to both of their satisfaction; the format of the production; and the time that it make take to produce the data. The

parties must then, **by no later than 28 days after the date of entry of this Order**, file a joint status update, which must also include the parties' proposal for how best to technically accomplish supplementation of the administrative record as directed.

It is SO ORDERED.

BARBARA D. HOLMES
United States Magistrate Judge